1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

EDWARD ITURRALDE,                          No.  2:22-cv-00272 DJC KJN P

12

          Petitioner,

13

    v.                                           ORDER &

14

MATTHEW ATCHLEY,                           FINDINGS & RECOMMENDATIONS

15

          Respondent.

16

17

I.  Introduction

18

      Petitioner Edward Iturralde, a state prisoner proceeding with counsel, filed an application

19

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2019

20

conviction for nine counts of lewd conduct upon four children under the age of 14 and one count

21

of attempting to prevent or dissuade witnesses from testifying against him.  Petitioner was

22

sentenced to an aggregate term of 106 years, 4 months to life in state prison.  He now raises the

23

following claims in his habeas petition:  (1) sufficiency of the evidence; (2) violation of due

24

process due to long timeframes pled in the information; and (3) statute of limitations expired as to

25

counts one through twelve.  Petitioner also requests that this Court take judicial notice of the state

26

court record.  (ECF No. 1.)  After careful review of the record, this Court concludes that the

27

petition should be denied and orders that petitioner's request for judicial notice be denied as

28

moot.

1

1   II. <u>Procedural History</u>

2        On May 15, 2019, a jury found petitioner guilty of nine counts of lewd conduct upon

3   four children under the age of 14 (Cal. Pen. Code, § 288(a); counts 1, 2, 4, 5, 6, 7, 10,

4   11 & 14), and one count of attempting to prevent or dissuade witnesses from testifying

5   against him (Cal. Penal Code § 136.1(a)(2); count 13).  (ECF No. 10-2 at 55-74.)  In August

6   2019, petitioner was sentenced to an aggregate term of 106 years, 4 months to life in state prison.

7   (<u>Id.</u> at 191-92, 209-13.)

8        Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

9   District.  The Court of Appeal affirmed the conviction on November 12, 2020.  (ECF No. 10-16.)

10  He then filed a petition for review in the California Supreme Court, which it denied on January

11  22, 2021.  (ECF No. 10-18.)

12       Petitioner filed the instant petition on February 11, 2022.  (ECF No. 1.)  Respondent filed

13  an answer.  (ECF No. 9.)  Petitioner filed a traverse.  (ECF No. 13.)

14  III. <u>Facts</u>[1]

15       After independently reviewing the record, this Court finds the state appellate court's

16  summary accurate and adopts it herein.  In its unpublished memorandum and opinion affirming

17  petitioner's judgment of conviction on appeal, the state appellate court provided the following

18  factual summary:

19            Consistent with the usual rules on appeal, we set forth the facts in the
20            light most favorable to the judgment. (*In re Daniel G.* (2004) 120
              Cal.App.4th 824, 828, fn.1.)

21            ***Sexual abuse of A. (counts 5, 6 & 7)***

22            Victim A., age 25 at trial, was seven years old when he and his
23            biological brothers, victims L. and C., were placed in the foster home
              of defendant and his wife (Mrs. Iturralde). A. subsequently was
24            adopted by defendant and Mrs. Iturralde when he was nine or 10
              years old.

25            When A. first came to live with defendant and Mrs. Iturralde, they
26            were living in Alameda County. In June of 2004, when A. was 11

27  _____
    [1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate
28  District in <u>People v. Iturralde</u>, No. C090456, 2020 WL 6605596 (Cal. Ct. App. Nov. 12, 2020), a
    copy of which was lodged by respondent as ECF 10-16.

2

years old, the family moved to Mountain House, in San Joaquin County. They lived in Mountain House from 2004 to 2009.

A. testified that defendant began molesting him at the Mountain House home when he was 11 or 12 years old and in the sixth grade. He remembered the year because the molestations started shortly after the family got a dog. He testified that the molestations continued for several years, until he was in the ninth grade.

A. testified that the molestations consisted of defendant, who usually was wearing only underwear, touching A.'s genitals, A. touching defendant's genitals, and/or defendant watching A. touch his own genitals. A. testified that defendant would refer to the touching as a "massage" or a "masseuse." The touchings occurred mainly at night when Mrs. Iturralde was at work. The touchings took place both in defendant's bedroom and in A.'s bedroom. A. explained that defendant would give him rewards for performing the "massages," such as permission to stay up late.

A. testified that the touchings happened so often that it became routine. He estimated the touchings occurred "at least 50 times," with a frequency of at least three or four times per week. When questioned by defense counsel about the frequency, A. replied, "I just know it happened a lot ...." A. testified that the touchings occurred when he was in the sixth, seventh, eighth, and ninth grades.

A. could not recall precise dates or times for most of the touchings, but he recalled one incident when he was in the eighth grade when defendant taught A. how to put on a condom and then watched A. masturbate. A. also recalled defendant masturbating A.'s penis while A. was wearing a condom and testified that this happened more than once. A. claimed there were times that C. was in the room when inappropriate touchings occurred. A. also testified to witnessing inappropriate touchings involving C.

A. testified that he, L., and C. did not discuss defendant's sexual abuse. He did not report the abuse to authorities because he did not want to be separated from his brothers, but he told two of his high school friends. A. recalled that once, during an argument, L. told Mrs. Iturralde that defendant was a pedophile, but she did not believe him. A. also told victim J., a foster child in defendant's home, to be careful around defendant because "stuff happened" to him when he was younger, but A. did not give J. details. When they were adults, A. and C. decided to contact the police after being encouraged to do so by their biological mother.

### *Sexual abuse of C. (counts 10 & 11)*

Victim, C., age 24 at trial, is the youngest adopted son of defendant and Mrs. Iturralde. C. first came to live with defendant as a foster child when he was five years old. When C. was nine years old and in fourth grade, the family moved to Mountain House. C. testified that defendant began molesting him when he was in the fifth grade. He remembered that because it was when he started playing a video game called Warcraft.

3

At first, the molestation consisted of defendant tickling C.'s genital area over the clothes, but it escalated to the point that defendant was touching C.'s genitals, and C. was touching defendant's genitals. Defendant referred to the inappropriate touchings as "massages." Defendant would get an erection during the massages. A massage would end with defendant turning away and stroking himself. C. did not see defendant ejaculate, but C. assumed he did. C. testified that the inappropriate "massages" happened multiple times per week from fifth through seventh grade. C. recalled one specific instance, in sixth grade, when he refused to reciprocate defendant's touching, and the following day noticed that his penis had been bruised. Defendant would tell C. he had to "massage" him to get basic necessities like new school clothes or gifts such as video games.

C. remembered the inappropriate touchings occurring in his bedroom. He thought they also may have happened in defendant's bedroom, but he did not specifically recall. C. thought A. may have witnessed him being molested, but he was uncertain of that as well. C. did not recall witnessing any inappropriate touching between defendant and L. or A.

C. never talked about the sexual abuse with his brothers or with victim J. C. wanted to tell someone about the abuse, but he felt guilt or shame probably prevented him from doing so. C. recalled that L. told Mrs. Iturralde about defendant's abuse, but she did not believe him. When C. was an adult, he reconnected with his biological mother and told her about the abuse. She encouraged him to go to the police, which he did, at age 21.

***Sexual abuse of L. (counts 1, 2 & 4)***

L., age 27 at trial, is the oldest adopted son of defendant and Mrs. Iturralde. He was about nine years old when he was placed under defendant and Mrs. Iturralde's foster care and 11 or 12 when they adopted him.

L. testified that the first of many improper touchings occurred when he was 11 or 12 years old and in the sixth grade, living in Alameda County, and defendant asked for a "massage." L. testified that during a "massage," defendant, wearing socks and boxer shorts and sometimes an undershirt, would have L. massage his testicles while defendant rubbed his own penis until he ejaculated.

L. testified that the inappropriate touchings happened on a "pretty consistent" basis, two to three times per week, when he was 11 or 12 years old and living in Alameda County. He testified that the inappropriate touchings continued after the family moved to Mountain House, when L. was 13 years old and preparing to attend eighth grade. He testified that the touchings finally stopped "near the end of the eighth grade" when L. "stood up for [himself]."

L. recalled one specific incident when defendant caught L. in the act of masturbating when L. was in the sixth grade. L. testified that during that incident, defendant grabbed his penis and "wriggle[d] [it] around" until L. pulled away.

4

L. did not tell anyone about the abuse for a long time because he felt shame and feared being separated from his brothers. However, during an argument with Mrs. Iturralde, L. angrily yelled, "'Do you know that your husband is making us rub on his balls?'" Both A. and C. were present when he said this. L. later recanted and told Mrs. Iturralde that he fabricated the accusation because he did not want to risk being separated from his brothers.[2] L. did not share information about defendant's abuse with J.

[N.2 Mrs. Iturralde's recollection of the incident was similar. She testified that she did not call the police at that time because she did not believe L. was telling the truth. Mrs. Iturralde insisted at trial that she never witnessed defendant interacting with any of their foster or adoptive children in a way that caused her concern.]

### Sexual abuse of J. (count 14)

Victim J., age 12 at the time of trial, was a foster child at defendant's home for several months in 2016, when J. was 10 or 11 years old. J. testified that defendant inappropriately touched him in his "private area," which made J. uncomfortable. J. claimed that the inappropriate touching started by defendant tickling him around his chest. Defendant then moved his hands lower and touched the area of J.'s genitals, over the clothes, for a minute or two until J. told defendant to stop. J. insisted the touching could not have been accidental. After the touching, defendant told J. not to tell anyone about it, but within a couple of days J. told two of his friends.

A video recording of a 2017 forensic interview of J. was played for the jury.[3] J.'s statements during the forensic interview were, in all material respects, consistent with his trial testimony. J. testified at trial that he told the truth during his interview.

[N.3 The jury watched the recorded portion of the interview with the aid of a transcript that was not admitted into evidence. The record on appeal does not include the recorded interview, but does include the transcript. Since neither party argues we should not rely on the transcript, we have considered it.]

### Testimony of Dr. Urquiza

Dr. Anthony Urquiza testified as an expert for the prosecution. The purpose of his testimony was to disabuse jurors of common myths and misconceptions about how children react to sexual abuse when it occurs. Dr. Urquiza testified why children delay reporting abuse and why the delay may continue into adulthood. He testified about the disclosure process, including why victims may not share every detail when they first disclose abuse and why victims may have trouble remembering certain details about the abuse, especially in cases of repeated abuse. He also explained why a victim may not appear frightened or scared of the abuser and the reasons that victims sometimes recant. Dr. Urquiza acknowledged it is possible for false accusations of abuse to occur.

In connection with Dr. Urquiza's testimony, the court gave a limiting

instruction that his testimony may be considered only for the purpose of understanding and explaining the behavior of the alleged victims in the case, and not as proof that any of the alleged sexual abuse occurred.

### Defendant's attempts to dissuade witnesses from testifying (count 13)

During trial, the prosecution played for the jury several recorded jail conversations between defendant and Mrs. Iturralde.[4] In those conversations, defendant repeatedly told his wife that the case against him would be closed if A., C., and L. agreed to drop the charges or if they failed to show up for the preliminary hearing. Defendant told his wife to tell their sons that they "have broken up the family," and that "[i]f they want this whole family ... together again, ... as one and all that they need to [drop the charges]." He said, "[I]f they care enough, they'll do what they need to do" and drop the charges, and if they did not, things would "get nasty." He also told his wife that it was in the best interest of A., C., and L. to drop the charges because if they testified his lawyer was going to "give them the runaround," and they would be "crying on the stand."

[N.4 The jury listened to the recorded portions of the conversations with the aid of a transcript that was not admitted into evidence. The record on appeal does not include the recorded conversations, but does include the transcript. Since neither party argues we should not rely on the transcript, we have considered it.]

Mrs. Iturralde mentioned to defendant that A. was still living with her and panicking because he might have to move out. Defendant told his wife that A. could not stay with her unless he dropped the charges and that A. needed to stop telling people he was molested. Defendant said, "You know, they ruin my life? [¶] ... [¶] Well I'll ruin their life."

Although A. depended on Mrs. Iturralde for transportation, defendant told his wife that if A. is subpoenaed, she was not to drive him to court, that A. "needs to find his own way because he's a key." Defendant told her that she was not to bring A., C., or L. to court, telling her to stay somewhere else the night before the hearing, and that the boys would "have to find their [own] way." Mrs. Iturralde agreed and said she was not "gonna be there for them," to which defendant responded, "No, you're gonna be the opposite."

After Mrs. Iturralde told defendant that A. had been subpoenaed for the preliminary hearing, defendant directed his wife to tell A. that he did not need to attend the preliminary hearing, even if subpoenaed, and that he would not get in trouble for failing to go. Defendant told his wife to tell C. and L. the same thing.

When questioned at trial, Mrs. Iturralde acknowledged that defendant had suggested she tell L., A., and C. not to testify, but she insisted that she never did so.

////

6

*The charges and motions to dismiss*

The information, filed in August 2018, originally charged defendant with 14 counts of lewd acts upon a child under the age of 14 (§ 288, subd. (a)) involving victims L., A., C., and J.

The four counts involving L. were alleged as: an "EARLIEST MEMORY OF TOUCHING," occurring in Alameda County between January 1, 2002, and December 31, 2004 (count 1); a "TOUCHING AFTER CAUGHT MAST[U]RBATING," occurring in Alameda County between January 1, 2002, and December 31, 2004 (count 2); a "TOUCHING WHEN BROTHER WALKED IN," occurring in San Joaquin County between January 1, 2002, and May 14, 2005 (count 3); and a "TOUCHING AFTER MOVE TO MOUNTAIN [HOUSE]," occurring in San Joaquin County between January 1, 2004, and May 13, 2005 (count 4).

The five counts involving A. were alleged as: a "TOUCHING IN VICTIM'S BEDROOM," occurring in San Joaquin County between January 1, 2004, and May 7, 2007 (count 5); a "TOUCHING IN DEFENDANT'S BEDROOM," occurring in San Joaquin County between January 1, 2004, and May 7, 2007 (count 6); a "TOUCHING WITH CONDOM," occurring in San Joaquin County between January 1, 2004, and May 7, 2007 (count 7); a "TOUCHING IN CAR," occurring in San Joaquin County between January 1, 2004, and May 7, 2007 (count 8); and a "TOUCHING WHEN HOME FROM SCHOOL," occurring in San Joaquin County between January 1, 2004, and May 7, 2007 (count 9).

The three counts involving C. were alleged as: a "TOUCHING WITNESSED BY BROTHER," occurring in San Joaquin County between January 1, 2004, and May 12, 2009 (count 10); a "TOUCHING IN VICTIM'S BEDROOM," occurring in San Joaquin County between January 1, 2004, and May 12, 2009 (count 11); and a "TOUCHING IN DEFENDANT'S BEDROOM," occurring in San Joaquin County between January 1, 2004, and May 12, 2009 (count 12).

The two counts involving victim J. were alleged as: a "TOUCHING IN LIVING ROOM," occurring in San Joaquin County between March 17, 2016, and November 29, 2016 (count 14); and a "TOUCHING IN CAR," occurring in San Joaquin County between March 17, 2016, and November 29, 2016 (count 15).

Each count of lewd acts upon a child (counts 1 through 12, 14, and 15) alleged that defendant committed the offense against more than one victim, within the meaning of the One Strike sentencing law (§ 667.61, subd. (e)(4)).

The information further alleged one count of attempting to prevent or dissuade a witness from testifying (§ 136.1, subd. (a)(2)) (count 13).

Before trial, defendant moved to dismiss counts 1 through 12 on various grounds. The trial court dismissed count 3, and authorized

7

> certain amendments to the information, but otherwise denied the motion. At trial, the prosecution requested, and the court granted, a motion to dismiss counts 8, 9, 12, and 15 due to insufficient evidence.

> ***Jury verdict and sentencing***

> After trial, the jury found defendant guilty as charged of counts 1, 2, 4, 5, 6, 7, 10, 11, 13, and 14, and found true the multiple victim allegations associated with the lewd conduct counts. On August 12, 2019, the trial court sentenced defendant to an aggregate term of 106 years four months to life in prison. Defendant timely filed a notice of appeal.

(ECF No. 10-16 at 2-10.)

IV.  <u>Standards for a Writ of Habeas Corpus</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged errors in the interpretation or application of state law.  <u>See</u> <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of holdings of the Supreme Court at the time of the last reasoned state court decision.  <u>Thompson v. Runnels</u>, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing <u>Greene v. Fisher</u>, 132 S. Ct. 38, 44-45 (2011)); <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011) (citing <u>Williams v. Taylor</u>, 529 U.S.

8

362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id.  Further, where courts of appeals have diverged in their treatment of an issue, there is no "clearly established federal law" governing that issue. See Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[2] Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); see also Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state court was '"erroneous"'").  "A state court's determination that a claim lacks merit precludes

---

[2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

9

federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  Id. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.")

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100.  Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, 298-301 (2013) (citing Richter, 562 U.S. at 98).  If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court.  See, e.g., Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court reviews the state court record to "determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court."  Richter, 562 U.S. at 101.  It remains the petitioner's burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  Stanley, 633 F.3d at 860 (citing Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006)).

V.  Petitioner's Claims

A. Claim One: Sufficiency of the Evidence

Petitioner claims that there is insufficient evidence to support his convictions for counts 1, 2, 4, 5, 6, 7, 10, 11 and 14 for the following reasons:  (1) the generic nature of and the inconsistencies in the witnesses' testimonies demonstrates the insufficiency of the evidence; (2) as to count four, the state did not prove that L. Doe was under 14 at the time of the offense; and (3) as to count 14, there is no evidence that petitioner attempted to intimidate or dissuade any of

11

1    the witnesses from testifying.  (ECF No. 1 at 28-41.)  In response, respondent argues it was

2    reasonable for the state court to reject a challenge to the sufficiency of the evidence because

3    inconsistencies in or the generic nature of the victims' testimony did not render the evidence

4    insufficient, the jury is presumed to have resolved conflicts in favor of the prosecution, and there

5    is adequate evidence to support the convictions.  (ECF No. 9 at 16-22.)

6         On direct appeal, the state court evaluated and rejected petitioner's sufficiency of the

7    evidence claim.

> Defendant argues the evidence adduced at trial was insufficient to support each of the 10 counts on which he was convicted. As discussed below, we conclude the evidence is sufficient to support the convictions.
>
> **A. *Standard of review***
>
> In considering a challenge to the sufficiency of the evidence, we do not reweigh the evidence, reevaluate the credibility of witnesses, or redetermine factual conflicts, those functions being within the exclusive province of the jury. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Rather, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Lindberg, supra*, at p. 27; *People v. Edwards* (2013) 57 Cal.4th 658, 715.) In making this determination, we resolve all conflicts in the evidence and draw all reasonable inferences in support of the conviction. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 408.) The test on appeal is not whether there is evidence to support an inference of innocence, but whether there is substantial evidence to support the verdict. (*Ochoa, supra*, at p. 1206.) A conviction will be overturned only if, on the evidence presented, no reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Hatch* (2000) 22 Cal.4th 260, 272; *People v. Bolin* (1998) 18 Cal.4th 297, 331.)
>
> **B. *The lewd conduct convictions (counts 1, 2, 4, 5, 6, 7, 10, 11, and 14)***
>
> The jury convicted defendant of nine counts of violating section 288, subdivision (a), which makes it a felony to "willfully and lewdly commit[ ] any lewd or lascivious act ... upon ... a child ... under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child ...." (§ 288, subd. (a).) Defendant argues insufficient evidence supports his convictions because they are based on generic and contradictory testimony. We are unpersuaded.
>
> ////

12

**1.** *Generic testimony*

In *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*), our Supreme Court held that "generic" testimony is sufficiently substantial to support a conviction for child molestation. (*Id*. at p. 313.) In reaching this decision, the court noted that "[c]hild molestation cases frequently involve difficult, even paradoxical proof problems" (*id*. at p. 305), which are especially pronounced in cases of so-called "resident child molesters." (*Id*. at p. 299.) "In such cases, the victim typically testifies to repeated acts of molestation occurring over a substantial period of time but, lacking any meaningful point of reference, is unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults." (*Id*. at p. 299.)

Prior to the court's decision in *Jones*, some appellate courts had concluded that a victim's inability to differentiate between the various acts of molestation was fatal to a conviction because it prevented the jury from unanimously agreeing upon the specific act constituting the crime. (*Jones, supra*, 51 Cal.3d at pp. 305, 308-310.) In *Jones*, the Supreme Court rejected this approach as having the perverse effect of insulating the most egregious child molesters from criminal liability merely because their abuse was repeated over an extended period of time. (*Id*. at pp. 300, 305, 309, 312-313.)

The court held that because the "particular details surrounding a child molestation charge are not elements of the offense," a victim's failure to specify a precise date, time, place, or circumstance does not preclude conviction. (*Jones, supra*, 51 Cal.3d at p. 315.) Purely "generic" testimony regarding multiple sexual molestations over a period of time is sufficiently substantial to support a conviction for child molestation, so long as the victim describes (1) the type of acts committed with sufficient specificity to assure the unlawful conduct occurred and to differentiate between the various types of proscribed conduct; (2) the number of acts committed with sufficient certainty to support each of the counts alleged; and (3) the general time period in which the acts occurred to assure they were committed within the applicable limitation period. (*Id*. at pp. 315-316.) The court referred to this as the "minimum quantum of proof." (*Id*. at p. 314.) "Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony" (*id*. at p. 316), but are "unnecessary to sustain a conviction." (*Id*. at p. 315.)

In *Jones*, the victim testified to repeated molestations involving oral copulation once or twice per month over (roughly) a two-year period of time. (*Jones, supra*, 51 Cal.3d at p. 302.) The victim recalled being molested in five different locations, including four to six times on camping trips, and eight to 10 times in the bathroom or shower, but the victim could not recall exact dates or provide additional details to differentiate the individual acts. (*Ibid*.) The court concluded that the victim's generic testimony was " 'certainly sufficient if believed to enable the jury to conclude [the victim] had been molested at least once during [each of the four time periods in question].' " (*Id*. at pp. 322-323.)

13

Applying the reasoning of *Jones* to the facts of this case, we conclude that the testimony of the victims as outlined above, comprising a mixture of generalized accounts of repeated molestations and specific acts of molestation, was sufficient to support the convictions for counts 1, 2, 4, 5, 6, 7, 10, 11, and 14. For each count, the victims described the kind of acts committed, described the number of acts committed with sufficient certainty to differentiate and support each count alleged, and described the general time period in which the charged acts occurred to assure they were committed within the applicable limitations period.

The jury also was instructed that " '[t]he People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless (one) you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense, or (two) you all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged.' "

On this record, defendant has failed to explain why the victims' testimony was too "generic" to support the convictions. Accordingly, we reject defendant's claim that the convictions are not supported by substantial evidence because the testimony was not sufficiently specific.

### 2. *Inconsistent testimony*

Defendant also argues there is insufficient evidence to support the convictions due to inconsistencies in the victims' testimony. For example, he contends L. made inconsistent statements about the frequency of the sexual abuse: initially telling police that the touchings occurred a total of three times, then telling police touchings occurred once per week, and then testifying that touchings occurred every other day or two to three times per week. Defendant claims the inconsistencies in the victims' testimony are so pervasive that no rational trier of fact could rely on their testimony to support the verdicts. Not so.

Inconsistencies in the testimony of a given witness do not render that testimony insufficient to support the verdict. (*People v. Maury* (2003) 30 Cal.4th 342, 403.) Resolution of conflicts and inconsistencies in the testimony of witnesses is in the exclusive province of the trier of fact. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*); *People v. Watts* (1999) 76 Cal.App.4th 1250, 1258-1259.) " 'An appellate court cannot substitute its judgment for that of the [trier of fact] unless the testimony ... "is so inherently improbable and impossible of belief as in effect to constitute no evidence at all." [Citations.]' " (*People v. Maxwell* (1979) 94 Cal.App.3d 562, 577.) " 'Such cases are rare indeed. [Citation.]' [Citation.]" (*People v. Ennis* (2010) 190 Cal.App.4th 721, 729.)

Absent exceptional circumstances, the testimony of a single witness is sufficient to support a conviction. (*Young, supra,* 34 Cal.4th p.

1181.) The fact that there was a potential source of impeachment does not render the testimony insufficient to support the verdict. The jury may give credence to a witness whose testimony is contradictory or inconsistent or false in part. (*People v. Fleming* (1961) 191 Cal.App.2d 163, 170; *People v. Maxwell, supra*, 94 Cal.App.3d at p. 577.) It is the role of the jury, not this court, to resolve any discrepancies in the evidence and decide which statements are true and which are not. (*People v. Ennis, supra*, 190 Cal.App.4th at p. 729; accord, *People v. Watts, supra*, 76 Cal.App.4th at pp. 1258-1259.)

Although there are inconsistencies in the testimony of the victims in this case, those inconsistencies do not demonstrate that the testimony was so inherently unreliable that no rational trier of fact could rely on the testimony to support the verdicts. Indeed, most of the inconsistencies involved relatively minor factual details, such as whether defendant was lying on the bed or sitting on the bed.

Defense counsel described the various inconsistencies in each child's testimony in his closing argument to the jury, arguing, as defendant does here, that the inconsistencies rendered that testimony unworthy of belief. But the jury, having heard and observed all the evidence, including Dr. Urquiza's expert testimony on how child sexual abuse is disclosed, disagreed. Defendant's claim on appeal amounts to little more than asking us to reweigh the evidence, which we cannot do. (*People v. Maury, supra*, 30 Cal.4th at p. 403; accord, *People v. Cardenas* (1982) 31 Cal.3d 897, 912.)

Where there were inconsistencies between a witness's trial testimony and earlier statements, the jury reasonably could have concluded such inconsistencies were unimportant, were the result of honest mistakes, or were adequately explained at trial. Where there were inconsistencies within a witness's testimony at trial or between the testimony of different witnesses at trial, it was within the province of the jury to determine what testimony to believe. There is nothing physically impossible or inherently incredible in the trial testimony of the victims. Accordingly, we conclude the victims' testimony provides ample evidentiary support for the verdicts.

### C. Count 4

In count 4, defendant was convicted of violating section 288, subdivision (a), based on inappropriate touching of L. after the move to Mountain House between January 1, 2004, and May 13, 2005. Defendant claims that the evidence was insufficient to support the verdict on count 4 because the People failed to prove that L. was under the age of 14 when he lived in Mountain House. Defendant claims that L. did not testify as to his age when the family moved to Mountain House because L. could not remember. Defendant is mistaken.

Victim L. testified that defendant molested him on a "pretty consistent" basis when he was 11 or 12 years old and living in Alameda County. L. testified that the molestations continued after the family moved to Mountain House, when he was 13 years old and

15

preparing to attend eighth grade. L. testified that the molestations at Mountain House continued until "near the end of the eighth grade." There is sufficient evidence in the record to support the verdict on count 4.

**D. *Count 13***

In count 13, defendant was convicted of violating section 136.1, subdivision (a)(2). To prove a violation of this offense, the People were required to establish that defendant knowingly and maliciously prevented or dissuaded, or attempted to prevent or dissuade, a victim or witness from attending or giving testimony at a legal proceeding. (§ 136.1, subd. (a); CALCRIM No. 2622.)[5] "The circumstances in which the defendant's statement is made, not just the statement itself, must be considered to determine whether the statement constitutes an attempt to dissuade a witness from testifying. [Citation.]" (*Wahidi, supra*, 222 Cal.App.4th at p. 806.) "If the defendant's actions or statements are ambiguous, but reasonably may be interpreted as intending to achieve the future consequence of dissuading the witness from testifying, the offense has been committed. [Citation.]" (*Ibid.*) Any person attempting the commission of the act is guilty of the offense, without regard to whether the attempt was successful. (§ 136.1, subd. (d); CALCRIM No. 2622.)

[N.5 "A person acts maliciously when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice." (CALCRIM No. 2622; *People v. Wahidi* (2013) 222 Cal.App.4th 802, 809 (*Wahidi*).) A violation of section 136.1 requires proof that the defendant specifically intended to prevent or dissuade a witness from testifying. (*Young, supra*, 34 Cal.4th at p. 1210.)]

Defendant contends the evidence at trial, consisting primarily of telephone calls between defendant and his wife while defendant was in jail, was insufficient to support the conviction on count 13. Defendant contends the evidence shows he merely requested that his wife "not facilitate" the transportation of A., C., and L. to court. Defendant argues there is no evidence that he attempted to intimidate or dissuade A., C., or L. from attending or testifying in court. The People, on the other hand, argue there is "overwhelming" evidence that defendant attempted to prevent or dissuade L., A., and C. from attending and testifying at the preliminary hearing. The People have the better argument.

The evidence shows that defendant believed that if A., C., and L. did not appear for the preliminary hearing, the case against him would be dropped. Acting on this belief, defendant discussed with his wife how they could pressure their sons into not testifying against him. Defendant instructed his wife to tell A., C., and L. that they did not need to attend the preliminary hearing, even if subpoenaed, and that they would not get in trouble for failing to go. He told his wife to tell A., C., and L. that they "have broken up the family," and that "[i]f they want this whole family ... together again, ... as one and all that they need to [drop the charges]." He said, "[I]f they care enough,

1    they'll do what they need to do" and drop the charges, and if they did
     not, things would "get nasty." Defendant said to his wife, "You
2    know, they ruin my life? [¶] ... [¶] Well I'll ruin their life."

3    Defendant told his wife not to allow A. to continue living with her
     unless he dropped the charges and stopped telling people he was
4    molested. Although A. depended on Mrs. Iturralde for transportation,
     defendant told his wife not to drive A. to court. He told her to leave
5    the night before the hearing and let A., C., and L. "find [their] own
     way." Mrs. Iturralde agreed that she was "not gonna be there for
6    them," and defendant responded, "No, you're gonna be the
     opposite."
7
     Although defendant never directly or indirectly told A., C., or L. not
8    to attend the preliminary hearing, jurors reasonably could have
     drawn the inference that defendant knowingly and maliciously
9    attempted, through his wife, to prevent or dissuade them from
     attending the hearing and testifying against him. (*Wahidi, supra*, 222
10   Cal.App.4th at pp. 804-805 [defendant violated section 136.1, subd.
     (a)(2) by approaching victim at mosque on day before preliminary
11   hearing with attempt to settle matter out of court]; see *People v.
     Kirvin* (2014) 231 Cal.App.4th 1507, 1511 [defendant convicted of
12   section 136.1, subd. (b)(2) for urging sister and others to deter victim
     from going to court].) Mrs. Iturralde acknowledged as much in her
13   trial testimony. When questioned whether anyone asked her to tell
     her sons not to testify, Mrs. Iturralde responded that defendant had
14   suggested that, but she merely "listen[ed]," and did not "obey[ ]."

15   We conclude the evidence is sufficient to support defendant's
     conviction on count 13 for attempting to prevent or dissuade his sons
16   from attending the preliminary hearing and testifying against him.

17   (ECF No. 10-16 at 10-18.)

18         A petitioner is entitled to habeas corpus relief on a sufficiency of the evidence claim, "if it

19   is found that upon the record evidence adduced at the trial no rational trier of fact could have

20   found proof of guilt beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979);

21   <u>see also Ngo v. Giurbino</u>, 651 F.3d 1112, 1115 (9th Cir. 2011).  This inquiry involves two steps.

22   First, the federal court must review the evidence in the light most favorable to the prosecution.

23   <u>Jackson</u>, 443 U.S. at 319.  If there are conflicting factual inferences, the federal court must

24   presume the jury resolved the conflicts in favor of the prosecution.  <u>Id.</u> at 326; <u>McDaniel v.</u>

25   <u>Brown</u>, 558 U.S. 120, 133 (2010) (per curiam).  Second, the federal court will "determine

26   whether the evidence at trial, including any evidence of innocence, could allow *any* rational trier

27   of fact to find the essential elements of the crime beyond a reasonable doubt." <u>United States v.</u>

28   <u>Nevils</u>, 598 F.3d 1158, 1165 (9th Cir. 2010) (en banc).

1    Although this Court's review is grounded in due process under the Fourteenth

2    Amendment, the Jackson standard "must be applied with explicit reference to the substantive

3    elements of the criminal offense as defined by state law."  Jackson, 443 U.S. at 324 n.16; Juan H.

4    v. Allen, 408 F.3d 1262, 1275-76 (9th Cir. 2005).  This Court will look to state law to establish

5    the elements of the offense and then turn to the federal question of whether the state court was

6    objectively unreasonable in concluding that sufficient evidence supported that conviction.  See

7    Johnson v. Montgomery, 899 F.3d 1052, 1056 (9th Cir. 2018).

8    "After AEDPA, we apply the standards of Jackson with an additional layer of deference."

9    Juan H., 408 F.3d at 1274; see Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam).  On

10   direct appeal at the state level, "it is the responsibility of the jury—not the court—to decide what

11   conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the

12   jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have

13   agreed with the jury."  Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam).  On habeas review,

14   "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence

15   challenge simply because the federal court disagrees with the state court.  The federal court

16   instead may do so only if the state court decision was 'objectively unreasonable.'"  Id. (quoting

17   Renico v. Lett, 559 U.S. 766, 773 (2010)).

18              i.   Generic and Inconsistent Testimony

19   First, petitioner claims that the witnesses' generic testimony is insufficient to support his

20   convictions for lewd conduct.  The state court rejected the claim based on the California Supreme

21   Court's decision in People v. Jones, 51 Cal. 3d 294 (1990).  (ECF No. 10-16 at 10.)  In Jones, the

22   California Supreme Court clarified that a victim's generic testimony is sufficient to support a

23   conviction because "the particular details surrounding a child molestation charge are not elements

24   of the offense and are unnecessary to sustain a conviction."  Jones, 51 Cal. 3d at 315.  Instead, the

25   victim must (1) describe the kind of acts committed with sufficient specificity, (2) describe the

26   number of acts committed with sufficient certainty to support the information, and (3) describe

27   the general time period in which these acts occurred.  Id. at 316.  The California Supreme Court

28   concluded that "the prosecution of child molestation charges based on generic testimony does not,

18

of itself, result in a denial of defendant's due process right to fair notice of the charges against him." Id. at 318.  Here, the state court applied Jones and concluded that the victims' testimony "comprising a mixture of generalized accounts of repeated molestations and specific acts of molestation, was sufficient to support the convictions for counts 1, 2, 4, 5, 6, 7, 10, 11, and 14." (ECF No. 10-16 at 12.)  After independently reviewing the record, this Court determines that the state court's conclusion was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.  See Brodit v. Cambra, 350 F.3d 985, 988-89 (9th Cir. 2003); Rhodes v. Marshall, 12 F. App'x 557, 558 (9th Cir. 2001).  Furthermore, the state court's determination that the victims described the kind of acts, number of acts, and general time period in which they occurred with sufficient certainty was not objectively unreasonable.  (See ECF No. 10-6 at 78-102; ECF 10-7 at 79-86, 106-45; ECF No. 10-10 at 63-79, 83-91.)  Because the state court reasonably concluded that the victims' generic testimony provided sufficient evidence to support the convictions, habeas relief is not warranted for this claim.

Second, petitioner claims that the victims' inconsistent testimony suggests there is insufficient to support his convictions.  At its core, this argument asks this Court to reweigh the evidence in the light most favorable to petitioner.  But that is not the correct standard.  "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.  Viewing the record in the light most favorable to the prosecution, this Court concludes that a rational trier of fact could have found that petitioner committed the charges for lewd conduct upon children under 14.  As noted above, the four victims described the kind and number of acts with sufficient certainty and the general timeframe the acts occurred to support the convictions.  To the extent that the victims' trial testimony was inconsistent with their prior statements, that is impeachment evidence.  Defense counsel explored those inconsistencies on cross-examination.  (ECF No. 10-7 at 40-61, 89-103, 162-68; ECF No. 10-10 at 45-61, 92-104.)  The trial court instructed the jury that "[y]ou alone must judge the credibility or believability of the witnesses…[y]ou may believe all, part, or none of any witness's testimony."

19

(ECF No. 10-2 at 105.)  The instruction also advised that "[d]o not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not."  (Id.)  Dr. Urquiza testified that child sexual abuse victims have a difficult time disclosing the abuse and are not good at remembering details or describing intangible aspects like time, particularly if the abuse occurred frequently.  (ECF No. 10-10 at 31-34.)  This Court agrees with the state court that most of the inconsistencies involved minor factual details, and the jury could have "concluded such inconsistencies were unimportant, were the result of honest mistakes, or were adequately explained at trial."  (ECF No. 10-16 at 15.)  Because the state court's decision was objectively reasonable, habeas relief is not warranted for this claim.

        ii.    Count 4

Next, petitioner claims that the state failed to prove beyond a reasonable doubt that L. Doe was under 14 when the sexual abuse occurred related to count 4 (January 1, 2004. and May 13, 2005), an element of the crime.  (ECF No. 1 at 38-39; see also ECF No. 10-2 at 133.)  A fairminded jurist could agree with the state court's decision rejecting this claim.  L. Doe was born on May 14, 1991.  (ECF No. 10-6 at 75.)  He testified that sexual abuse started when he was 11 or 12 living at Palomares House.  (Id. at 92.)  It continued when they moved to the Mountain House when he was in eighth grade, and he guessed he was about twelve or thirteen at the time.  (Id. at 94-95; see also id. at 101-02 ("Q: Do you know if the touching – or the massage continued after you turned 14? A: It did continue well into eighth grade."))  Based on his testimony, it was objectively reasonable for the state court to conclude that there was sufficient evidence in the record to support the conviction on count 4.

        iii.    Count 13

Petitioner asserts that there is insufficient evidence to support his conviction of attempting to intimidate the witnesses into not testifying under California Penal Code § 136.1(a) (Count 13). To be convicted of this crime, the state had the burden of proving:  (1) petitioner maliciously tried to prevent or discourage the L. Doe, A. Doe, and C. Doe from attending or giving testimony at the preliminary hearing; (2) L. Doe, A. Doe, and C. Doe were witnesses or crime victims; and (3) petitioner knew he was trying to prevent or discourage them from attending or giving testimony at

the preliminary hearing and intended to do so.  (Cal. Penal Code § 136.1(a); ECF No. 10-2 at 136 (CALCRIM No. 2622).)  The state court determined that "[a]lthough defendant never directly or indirectly told A., C., or L. not to attend the preliminary hearing, jurors reasonably could have drawn the inference that defendant knowingly and maliciously attempted, through his wife, to prevent or dissuade them from attending the hearing and testifying against him."  (ECF No. 10-16 at 17.)

Based on the record, the state court's determination was not objectively unreasonable. Petitioner believed that the charges would be dropped if A. Doe, C. Doe, and L. Doe did not appear for the preliminary hearing.  (See ECF No. 10-2 at 237 ("Well, whoever – whoever charges me, I mean, I guess, ah, if they don't show up to the trial…they discount it or something like that."); id. ("Yeah and if they don't show up at the courthouse, I guess they close that ticket."); id. at 242 (petitioner saying that tomorrow is the "break it day" unless "they do what they need to do which is…drop the charges…."); id. at 262 ("If they don't go [to the preliminary hearing] then…the whole case is gone."))  In conversations with his wife, petitioner asked his wife not to drive the boys to the courthouse to prevent them from testifying.  (See id. at 250 (petitioner instructing his wife that "if [A. Doe] gets subpoenaed to come to court you are not to drive him to court…but don't tell him that…[y]ou just leave the night before somewhere or go stay with somebody and he's gonna have to figure out how to go."); id. at 251 ("A [wife]: But they gonna find a way I'm not gonna be there for them, nope. Q [petitioner]: No, you're gonna be the opposite."); id. at 254 (stating that kids will not get in trouble for not showing up in court under subpoena).)  Petitioner also told his wife "[y]ou know, they ruin my life...Well I'll ruin their life." (Id. at 244.)  He also asked his wife to tell A. Doe that he has to move out of the house or drop the charges.  (Id. at 244-45; see also id. at 247 (petitioner told his wife that "[i]f they want this whole family to be…together again" they need to drop the charges).)  Because the state court reasonably concluded that the conviction under count 13 was supported with sufficient evidence, habeas relief not warranted for this claim.

////

////

B. Claim Two: Information Did Not Provide Reasonably Specific Time Frame for Crimes

Next, petitioner claims that the information provided unconstitutionally vague time frames for each charge, depriving petitioner of the ability to fairly defend himself.  (ECF No. 1 at 41-44.) In response, respondent argues that it was reasonable for the state court to reject the claim because fairminded jurists could agree that, given that the date of the crime is not an element of petitioner's convictions, the lack of specific notice as to the dates did not violate his constitutional rights.  (ECF No. 9 at 23-25.)

In the last well-reasoned opinion, the state court addressed this claim as follows:

> Prior to trial, defendant filed a section 995 motion to dismiss counts 1 through 12 of the information. Among other things, the motion argued that those counts should be dismissed because (1) the long timeframes pled in the counts violated defendant's right to due process, and (2) the counts are barred by the applicable statute of limitations. The court denied the motion. On appeal, defendant raises the same arguments that were rejected below. We conclude that neither argument has merit and that the trial court properly denied the request to dismiss the lewd conduct counts.

> **A. *Standard of review***

> To the extent defendant's section 995 motion rests on legal issues, such as questions of statutory interpretation or procedural fairness, our review is de novo. (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072; *Tafti v. County of Tulare* (2011) 198 Cal.App.4th 891, 896.) We review questions of fact under the deferential substantial evidence standard, drawing every legitimate inference in favor of the trial judge's determination. (*People v. Hall* (1971) 3 Cal.3d 992, 996; *People v. San Nicolas* (2004) 34 Cal.4th 614, 654; *People v. Johnson* (1991) 231 Cal.App.3d 1, 6.)

> **B. *Due process***

> Defendant contends that the long timeframes pled in the information for counts 1, 2, 4, 5, 6, 7, 10, and 11 violated due process because they were insufficient to give him reasonable notice of the charges against him.[6] He notes that counts 1 and 2 involved a three-year window (Jan. 1, 2002, to Dec. 31, 2004); that count 4 involved a one-and-a-half-year window (Jan. 1, 2004, to May 13, 2005); that counts 5, 6, and 7 involved a three-and-a-half-year window (Jan. 1, 2004, to May 7, 2007); and that counts 10 and 11 involved a five-and-a-half-year window (Jan. 1, 2004, to May 12, 2009). Defendant argues the timeframes alleged in the information were too vague and imprecise to allow him to fairly defend himself at trial.

> [N.6 Although defendant also discusses counts 3, 8, 9, and 12 in his brief, we need not consider those counts because they were dismissed.]

22

Defendant's claim rests on the premise that he was entitled to notice of the specific time of the offense in the accusatory pleading. Not so.

Due process requires that a criminal defendant be advised of the charges against him so that he has a reasonable opportunity to present a defense. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 554.) But that notice is not required to be encompassed within the charging instrument itself. In modern criminal prosecutions, the information plays an important but "limited" role, informing the defendant of the kind and number of offenses with which he or she is charged. (*People v. Jeff* (1988) 204 Cal.App.3d 309, 342 (*Jeff*).) The time, place, and circumstances of the charged offenses are left to the preliminary hearing. (*Ibid.*) Thus, it is the transcript of the preliminary hearing, not the accusatory pleading, that serves as "the touchstone of due process," affording the defendant notice of the criminal acts against which he must defend. (*Ibid.*; see also *Jones, supra,* 51 Cal.3d at p. 317 [in addition to the information and preliminary examination, defendant may learn additional details through demurrer or discovery].)

Further, as our Supreme Court held in *Jones, supra,* 51 Cal.3d 294, the particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction. Even generic testimony may sustain a conviction. (*Id.* at p. 315.) Although the victim must describe the general time period in which the acts occurred to assure they were committed within the applicable limitation period, the defendant has no due process right to notice of the specific time or place of the offense. (*Id.* at p. 317; § 955.)

In a child sexual molestation case, the accusatory pleading functions merely to inform the defendant of the kinds and number of offenses charged, and whether they occurred within the applicable limitations period. (*Jeff, supra,* 204 Cal.App.3d at p. 342; *Jones, supra,* 51 Cal.3d at p. 312; *People v. Fernandez, supra,* 216 Cal.App.4th at p. 555.) The defendant "'must be prepared to defend against all offenses of the kind alleged in the information as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information.'" (*People v. Jones, supra,* 51 Cal.3d at p. 317; accord, *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1581.) "So long as the evidence presented at the preliminary hearing supports the number of offenses charged against defendant and covers the timeframe(s) charged in the information, a defendant has [received] all the notice the Constitution requires." (*Jeff,* at p. 342.)

The information here adequately apprised defendant of the nature and number of offenses of which he was accused. And defendant has not shown—or even argued—that he did not receive fair notice of the charges against him based on the evidence adduced at the preliminary hearing (or in pretrial discovery). Accordingly, we reject his due process claim.[7]

[N.7 Because we find the record is adequate to address his due process claim, we deny defendant's belated request to augment the

1
2

record with the transcript of the trial court's ruling on the section 995 motion.]

3

(ECF No. 10-16 at 18-20.)

4

A criminal defendant must have adequate notice of the charges against him.  See Lopez v.

5

Smith, 574 U.S. 1, 5 (2014) (per curiam); Russell v. United States, 369 U.S. 749, 763-64

6

(1962); In re Oliver, 333 U.S. 257, 273-74 (1948); Cole v. Arkansas, 333 U.S. 196, 201 (1948).

7

To determine whether a criminal defendant has received fair notice of the charges against him, a

8

reviewing court must review the information or indictment.  Gautt v. Lewis, 489 F.3d 993, 1003

9

(9th Cir. 1997).  An indictment is constitutionally adequate if it (1) contains the elements of the

10

charged offense and gives defendant notice of the charges, and (2) protects defendant against

11

double jeopardy.  Russell, 369 U.S. at 763.  The Ninth Circuit has recognized that a defendant

12

may receive constitutionally adequate notice of an underlying charge by means other than the

13

charging document.  See, e.g., Morrison v. Estelle, 981 F.2d 425, 427-49 (9th Cir. 1992);

14

Calderon v. Prunty, 59 F.3d 1005, 1009 (9th Cir. 1995) ("We have also recognized that a

15

defendant can be adequately notified of the nature and cause of the accusation against him by

16

means other than the charging document.")

17

Petitioner's claim that he did not receive adequate notice of the charges against him

18

because of the long timeframes listed in the information fails.  There is no clearly established

19

Supreme Court precedent holding that an information alleging the time period, rather than exact

20

dates, when the offenses occurred violates due process.  See, e.g., United States v. McCown, 711

21

F.2d 1441, 1450-51 (9th Cir. 1983).  To the contrary, federal courts have recognized that in cases

22

involving sexual abuse of minors the exact dates of the alleged offenses cannot be determined

23

with specificity.  See, e.g., Brodit, 350 F.3d at 988-89 (charging a defendant with the crime of

24

three or more acts of sexual abuse in a specified time period, without identifying the exact dates

25

when the abuse occurred, did not violate clearly established Supreme Court law); Paul v. Gibson,

26

No. CV 12-6238-GAF (JEM), 2014 WL 2547594, at *23 (C.D. Cal. Apr. 22, 2014); Aldape v.

27

Lopez, No. CV 07-07316-JSL (AJW), 2010 WL 5168942, at *6 (C.D. Cal. Oct. 27, 2010);

28

1    <u>Burbine v. Scribner</u>, No. CIV S-04-1691 LKK EFB P, 2009 WL 2136303, at *21-24 (E.D. Cal.

2    July 15, 2009).  Because there is no clearly established Supreme Court precedent, this Court

3    cannot conclude that the state court was objectively unreasonable in deciding that petitioner

4    received adequate notice of the nature and number of offenses.  Accordingly. this Court

5    recommends denying habeas relief on this claim as well.

6        C.  <u>Claim Three: Statute of Limitations for Counts One Through Twelve</u>

7            Lastly, petitioner claims that the trial court erred in denying his pretrial motion that counts

8    one through twelve should be dismissed because the statute of limitations had run before

9    commencement of prosecution, and that his convictions violated the ex post facto clause.  (ECF

10   No. 1 at 45-49.)  In response, respondent contends that the state court's finding that California

11   law was not violated is binding on this Court, and a fairminded jurist could find that there was no

12   ex post facto violation because the statute of limitations had not run.  (ECF No. 9 at 25-27.)

13           In the last well-reasoned decision, the state appellate court considered and rejected

14   petitioner's claim as follows:

15                Defendant also argues that counts 1, 2, 4, 5, 6, 7, 10, and 11 should
                 have been dismissed because they were barred by the statute of
16               limitations. Defendant argues that under section 800, the statute of
                 limitations to bring a prosecution for a violation of section 288,
17               subdivision (a) is six years. Because the counts at issue allegedly
                 occurred between 2002 and 2009, he argues the limitations period
18               lapsed no later than 2015, three years before the information was
                 filed.
19

20               Defendant acknowledges that under section 799, offenses carrying a
                 life term are not subject to a statute of limitations. (§§ 799, 800.) He
21               further acknowledges that under the One Strike law (§ 667.61), a
                 defendant convicted of section 288 violations against multiple
22               victims is subject to a sentence of life imprisonment. (§ 667.61,
                 subds. (b) & (e)(4); see also *People v. Perez* (2010) 182 Cal.App.4th
23               231, 239-240 [holding that section 667.61 is an alternative penalty
                 scheme that applies under section 799].) However, defendant argues
24               the version of the One Strike law in effect when he committed the
                 crimes did not include section 288, subdivision (a) as a qualifying
25               offense, and therefore constitutionally cannot be applied to him.

26               The People disagree that section 288, subdivision (a) was not a
                 qualifying offense under the One Strike law at the time the crimes
27               were committed. They also argue that, irrespective of the One Strike
                 law, the prosecution of defendant was timely under section 801.1.
28               Because we agree with this latter argument, we need not address the
                 former.

Effective January 1, 2001, former section 803, subdivision (h) established a 10-year statute of limitations for those felonies enumerated in section 290, subdivision (c) (formerly section 290, subdivision (a)(2)(A)). The 10-year statute of limitations for section 290 offenses has been continuously in effect since January 1, 2001, and at all relevant times has applied to violations of section 288. (*People v. Simmons* (2012) 210 Cal.App.4th 778, 788; *In re White* (2008) 163 Cal.App.4th 1576, 1582-1583 (*White*); § 801.1, subd. (b); former § 803, subd. (h), as enacted by Stats. 2000, ch. 235, § 1; former § 290, as enacted by Stats. 2000, ch. 240, § 1, and Stats. 2007, ch. 579, §§ 7 & 8.)[8] Thus, at the time defendant's crimes were committed, the earliest date the limitations period could have expired for any of counts 1, 2, 4, 5, 6, 7, 10, or 11 was January 1, 2012—10 years after the earliest date alleged in the information.

[N.8 Effective January 1, 2002, the 10-year statute of limitations was moved from former section 803, subdivision (h)(1), to subdivision (i)(1), without textual change. (*White, supra,* 163 Cal.App.4th at p. 1580.) Effective January 1, 2005, it was recodified, with minor changes not relevant here, as former section 801.1. (*White,* at p. 1580; former § 801.1, as enacted by Stats. 2004, ch. 368, § 1; see also Stats. 2005, ch. 479, § 2.) When former section 801.1, subdivision (a) was added in 2006, the 10-year statute of limitations for section 290 offenses became new subdivision (b), which is where it remains in the current law. (§ 801.1, subd. (b); former § 801.1, as enacted by Stats. 2005, ch. 479, § 2.)]

In 2005, well before the 10-year limitations period would have elapsed, the Legislature enacted former section 801.1, subdivision (a). (Former § 801.1, subd. (a), as enacted by Stats. 2005, ch. 479, § 2.) Effective January 1, 2006, it extended the time for prosecution of certain felony sex offenses, including violations of section 288, until the victim's 28th birthday if the crime was alleged to have been committed when the victim was under the age of 18 years. (Former § 801.1, subd. (a), as enacted by Stats. 2005, ch. 479, § 2.) Another amendment to section 801.1, which took effect in January 2015—while the victims in this case were still under the age of 28—further extended the time for prosecution until the victim's 40th birthday, which is the current law. (Former § 801.1, as enacted by Stats. 2014, ch. 921, § 1; § 801.1.)

Section 801.1, subdivision (a) applies to defendant because he was charged with section 288 violations alleged to have been committed when the victims were under 18 years of age. And under section 801.1, subdivision (a), the prosecution of counts 1, 2, 4, 5, 6, 7, 10, and 11 was timely because it was commenced prior to each victim's 40th birthday.[9] Further, because the limitations period was extended before the prior limitations period expired, application of section 801.1 raises no ex post facto concerns. (*People v. Simmons, supra,* 210 Cal.App.4th at p. 787-788; *Stogner v. California* (2003) 539 U.S. 607, 618-620 [156 L.Ed.2d 544, 556-557]; *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1272-1273; see also § 803.6, subd. (b).)

[N.9 Because all the victims were under the age of 28 at the time of

1  trial, we would reach the same result even under the former version
2  of the statute.]

3  Because all the victims were under the age of 28 at the time of trial,
   we would reach the same result even under the former version of the
4  statute.

5  (ECF No. 10-16 at 21-23.)

6       Federal habeas corpus relief is only available for violations of federal law.  See Wilson,

7  562 U.S. at 5; Estelle, 502 U.S. at 67-68.  Here, the state court concluded that the state's

8  prosecution of petitioner was timely under California's statute of limitations.  It is axiomatic that

9  a state court's interpretation of state law is binding on a federal habeas court.  Bradshaw v.

10 Richey, 546 U.S. 74, 76 (2005) (per curiam); Estelle, 502 U.S. at 71-72.  Petitioner's attempt to

11 challenge the state court's interpretation of state law on habeas review necessarily fails.

12      Like on direct appeal, petitioner also contends that the extension of the statute of

13 limitations raises ex post facto concerns.  (ECF No. 1 at 47-49.)  This Court concludes that the

14 state court's rejection of petitioner's ex post facto claim was reasonable.  The state court

15 concluded that California Penal Code § 801.1 applies to petitioner "because he was charged

16 with section 288 violations alleged to have been committed when the victims were under 18 years

17 of age." (ECF No. 10-16 at 22.)  Because the limitations period was extended before the prior

18 limitations period expired, the state court decided that applying section 801.1 raised no ex post

19 facto issues.  (Id. at 22-23.)  This determination was not an unreasonable application of clearly

20 established Supreme Court precedent.  See Stogner v. California, 539 U.S. 607, 632 (2003);

21 Renderos v. Ryan, 469 F.3d 788, 795 (9th Cir. 2006) (rejecting ex post facto claim because

22 extension of limitations period was enacted while the original limitations period was still running

23 on the claims against petitioner).  In Stogner v. California, the Supreme Court held that "a law

24 enacted after expiration of a previously applicable limitations period violates the *Ex Post Facto*

25 Clause when it is applied to revive a previously time-barred prosecution." Stogner, 539 U.S. at

26 632-32.  Unlike Stogner, in this case the limitations period had not yet expired when petitioner

27 was prosecuted for his crimes.  This Court recommends denying habeas relief on this claim.

28 ////

1    VI. <u>Request for Judicial Notice</u>

2          Petitioner requests that this Court "take judicial notice of the transcripts, records, and files

3    in Edward Iturralde:  San Joaquin County, case number STKCRFE20180003808; California

4    Court of Appeal, Third District, case number C090456; California Supreme Court case number

5    S266174."  (ECF No. 1 at 14.)  Federal Rule of Evidence 201(b) provides that a federal court may

6    take judicial notice of an adjudicative fact "that is not subject to reasonable dispute" if the fact

7    "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and

8    readily determined from sources whose accuracy cannot reasonably be questioned."  Under this

9    rule, courts may take judicial notice of "*undisputed* matters of public record," but generally may

10   not take judicial notice of "*disputed* facts stated in public records."  <u>Lee v. City of Los Angeles</u>,

11   250 F.3d 668, 690 (9th Cir. 2001).  To the extent that petitioner disputes facts stated in the state

12   record, judicial notice would be improper.  Nevertheless, because this Court can review the

13   underlying lodged state court record in assessing petitioner's habeas petition (without taking

14   judicial notice of it), this Court denies as moot petitioner's request for judicial notice.

15   VII. <u>Conclusion</u>

16         Accordingly, IT IS HEREBY ORDERED that petitioner's request for judicial notice (ECF

17   No. 1) be denied as moot.

18         Furthermore, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

19   habeas corpus (ECF No. 1) be denied.

20         These findings and recommendations are submitted to the United States District Judge

21   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

22   after being served with these findings and recommendations, any party may file written

23   objections with the court and serve a copy on all parties.  Such a document should be captioned

24   "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

25   he shall also address whether a certificate of appealability should issue and, if so, why, and as to

26   which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

27   applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

28   § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 5, 2023

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE